ROBERT MITCHELL and EVELYN MITCHELL, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Mitchell v. Commissioner
Docket Nos. 8270-75, 4925-76, 4926-76, 4927-76.
United States Tax Court
T.C. Memo 1982-162; 1982 Tax Ct. Memo LEXIS 578; 43 T.C.M. (CCH) 937; T.C.M. (RIA) 82162; March 30, 1982. *578 Held, petitioners underreported income for all years in issue. Held further, petitioners are liable for the addition to tax provided under section 6653(b), I.R.C. 1954, for all years in issue except 1965. Held further, the statute of limitations bars respondent from assessment and collection of the deficiency determined for 1965. Sec. 6501(a), I.R.C. 1954. Robert E. Garfield and Douglas J. Paul, for the petitioners. Thomas J. Stalzer, for the respondent. WILES MEMORANDUM FINDINGS OF FACT AND OPINION WILES, Judge: In these consolidated cases, respondent determined the following deficiencies in, and additions to, petitioners' Federal income tax: Docket
Taxable
Addition to Tax
Number
Year Ended
Deficiency
Sec. 6653(b) [2]
8270-75
12/31/71
$ 17,449.91
$ 8,724.96
4925-76
12/31/65
1,388.78
694.39
12/31/66
9,137.06
4,568.53
12/31/67
73,223.15
36,611.58
12/31/68
74,431.44
37,215.72
12/31/69
57,333.72
28,666.86
4926-76
12/31/70
4,942.09
2,471.05
4927-76
3/31/67
2,200.16
1,100.08
3/31/68
44,596.10
22,298.05
3/31/69
44,497.45
24.426.72
3/31/70
29,989.54
17,267.33
3/31/71
228.08
114.04
After concessions, the issues for decision *579 are as follows: 1. Whether petitioners are liable for deficiencies for the years in issue. 2. Whether petitioners are liable for additions to tax under section 6653(b). 3. Whether the statute of limitations bars assessment and collection of the deficiencies determined by respondent. FINDINGS OF FACT Some of the facts have been admitted, deemed admitted under Rule 90, [3] or stipulated. The admissions, stipulations, and stipulated exhibits are incorporated herein by this reference. [3]
On the date petitions in docket Nos. 8270-75, 4925-76, and 4926-76 were filed, petitioners Robert Mitchell and Evelyn Mitchell resided in Bedford, Ohio. Robert Mitchell filed individual Federal income tax returns for the taxable years 1965, 1968, and 1969 with the Internal Revenue Service Center, Cincinnati, Ohio. Robert Michell did not file Federal income tax returns for the taxable years 1966 and 1967. Docket No. 4925-76 concerns Robert Mitchell's income tax liability for the taxable years 1965 through 1969. During 1970 and 1971, petitioners Robert Mitchell and Evelyn Mitchell were husband and *580 wife, and they filed joint Federal income tax returns for those years with the Internal Revenue Service Center, Cincinnati, Ohio. Docket Nos. 8270-75 and 4926-76 concern their income tax liability for the taxable years 1971 and 1970, respectively. Petitioner Film Craft Corporation (hereinafter FCC) is a corporation organized under the laws of the State of Ohio, which had its principal office and place of business in Garfield Heights, Ohio, on the date the petition herein was filed. On August 19, 1971, FCC filed delinquent Federal corporate tax returns for each of the taxable years ended March 31 of 1965 through 1971 with the Internal Revenue Service Center, Cincinnati, Ohio. During 1945 through 1948, Robert Mitchell attended Hiram College in Hiram, Ohio, where he completed three years of college education. At Hiram College, he successfully completed an accounting course as well as several economics courses. On April 1, 1961, Robert Mitchell and Frank Spiegel (hereinafter Spiegel) established FCC, each owning 50 percent of the corporation's stock. Prior to 1965, Dorothy J. Strok (hereinafter Strok) contributed $ 11,000 to FCC in exchange for a one-third interest in the corporation. *581 In 1965, Robert Mitchell purchased Spiegel's one-third interest in FCC, [4] and during all the years at issue he owned two-thirds of FCC's stock. During all times pertinent herein, FCC was engaged primarily in the business of processing and developing film, and the wholesaling of cameras, film, and photographic equipment. At all relevant times hereto, Robert Mitchell was the president of FCC and the only shareholder actively involved in the operation of its business. He was authorized to sign all of the company's checks. [5] *582 During 1965, 1966, 1967, 1968, 1969, 1970, and 1971, Robert Mitchell received a salary from FCC of $ 7,800, $ 9,900, $ 10,720, $ 10,920, $ 12,220, $ 13,988, and $ 29,440, respectively. During 1970 and 1971, Evelyn Mitchell held the office of Secretary at FCC and received a salary from the company of $ 5,980 and $ 10,980, respectively. In addition, Elvira Lanum and Betty Porubsky were each employed by FCC from 1961 through 1972. During 1966 FCC issued ten checks, totaling $ 14,386. These stubs indicated that they had been issued as payment by FCC to Lee-Land Photo, Inc., [6] for flashbulb purchases. Seven of these ten checks were payable to "cash," and three were payable to "Robert Mitchell." Of the seven checks made payable to cash, four were endorsed by Robert Mitchell, two by Sam Schwartz, and one by Mandon House Interiors. Robert Mitchell endorsed all three of the checks made payable to him. While all of these 1966 checks were coded by FCC's "purchases" account, [7] three of these checks contained notations (on their face) which indicated that they were issued with respect to "accounts payable," "notes payable" on loans. In addition to the above ten checks, Robert Mitchell caused FCC to issue checks to Spiegel totaling $ 1,500 during 1966, in payment for the FCC stock that Spiegel had sold to him. Robert Mitchell's returns did not include in income the FCC checks issued to Frank Spiegel or those issued in 1966 for the purported flashbulb purchases; the purported flashbulb purchases were *583 claimed by FCC as a deduction on its return for the fiscal year ended March 31, 1967. During the years 1966, 1967, and 1968, FCC processed all of the black and white film for two retail stores operated by Lee-Land Photo, Inc. (hereinafter LLP) in Ohio. One of LLP's stores was located in Richmond Heights and was managed by John Ciresi (hereinafter Ciresi); the other store was located in Cleveland and was managed by Ciresi's father. From April 7, 1966 through June 13, 1968, FCC issued twenty-three checks totaling $ 1,286, $ 34,265.50, and $ 20,980, respectively, for such years. The checks were payable to "cash" and were received by Ciresi (hereinafter these checks shall sometimes be referred to as the Ciresi items). All of the *584 Ciresi items were coded to FCC's "purchases" account, [8] and check stubs corresponding to six of the Ciresi items contained notations which indicated that the checks were issued to purchase flashbulbs from LLP. Ciresi cashed all these checks and then personally delivered the proceeds back to Robert Mitchell. Robert Mitchell's returns did not include in income the Ciresi items, and FCC claimed deductions for these items on its returns for the fiscal years ended March 31, 1967 through 1969. During October 1967, Robert Mitchell and Strok formed an equal partnership known as D and B Auto Lease (hereinafter Auto Lease) for the purpose of leasing automobiles to FCC. On October 30, 1967, they opened checking account no. XXXX1714 at the Central National Bank, Cleveland, Ohio (hereinafter the Central National Bank), in the name of Auto Lease, on which Robert Mitchell was authorized to sign checks. Auto Lease purchased four automobiles, but only one, a 1967 Ford Falcon, was actually leased to FCC; the other three vehicles were acquired by Strok for her personal use. Less than one month after Auto Lease rented the Ford Falcon to FCC, it was destroyed in an accident. Following *585 the accident, Auto Lease abandoned is plan to lease automobiles to FCC and, in February 1968, it began to engage in the sale and exchange of corporate securities through the brokerage firm of Hayden, Miller and Co., Cleveland, Ohio (hereinafter Hayden, Miller and Co.). On February 15, 1968, April 16, 1968, and January 15, 1969, FCC issued three checks payable to "Auto Lease" in the amounts of $ 1,395, $ 1,500, and $ 3,000, respectively. These checks were coded to FCC's "Car rental expense" account, [9] but their proceeds were used by Auto Lease to purchase corporate securities through the partnership's account with Hayden, Miller, and Co. Robert Mitchell's returns did not include the FCC checks issued to Auto Lease in income, and FCC claimed deductions for these items on its returns for the fiscal years ended March 31 of 1968 and 1969. During 1967, 1968, and 1969, FCC issued at least twenty-two checks totaling $ 34,100, $ 33,950, and $ 13,000, respectively, to Robert Mitchell. After January 29, 1971, the date that the Internal Revenue Service (hereinafter IRS) informed Robert Mitchell of its intention to audit his returns and FCC's taxable years ending March 31 of *586 1965 through 1970, these checks were coded to FCC's "Notes - Bob Mitchell" account and promissory notes were executed which represented this alleged debt. These purported loans checks were either cashed by Robert Mitchell or deposited in his account at the Central National Bank. Robert Mitchell's returns did not include these checks in income, and he claimed a deduction for interest allegedly paid with respect to these purported loans on his 1971 return. From August 22, 1967 through December 15, 1970, FCC received checks from customers totaling $ 7,174.25, $ 18,056.91, $ 36,608.67, and $ 10,232.04, respectively. Robert Mitchell diverted the proceeds of these checks (hereinafter these checks shall sometimes be referred to as the identified diverted corporate receipts) for personal purposes. He diverted these checks either by endorsing and depositing them into his checking account at the Central National Bank or by depositing other FCC funds into his checking account on the same date the checks were issued, which exceeded the face amounts of the checks. Neither Robert Mitchell's nor FCC's returns included these items in income. On April 30, 1969, Robert Mitchell opened account *587 no. XXXX4934 at the Central National Bank, in the name of Photo-Mail, Inc. (hereinafter Photo-Mail), on which Robert Mitchell was authorized to sign checks. Despite the name appearing on this checking account, Photo-Mail was never officially incorporated under the laws of any state; it was merely a division of FCC. During 1969, 1970, and 1971, deposits were made to Photo-Mail's account at the Central National Bank in the amounts of $ 4,475.04, $ 711.35, and $ 4,859.86, respectively. On January 29, 1971, Internal Revenue Service Agent Joseph Kilbane informed Robert Mitchell that the IRS planned to commence an audit to determine whether Robert Mitchell or FCC failed to report income and owed taxes thereon. Since FCC had not yet filed its returns for its taxable years ended March 31 of 1965 through 1970, Robert Mitchell engaged the services of Hartley Bergman (hereinafter Bergman), a public accountant, to prepare FCC's returns for such years and the taxable year ended March 31, 1971, and to construct accounting records for the company. To prepare FCC's returns, Bergman reviewed FCC's books and records, which were inadequate, incomplete, and in a state of disarray. Bergman provided *588 Robert Mitchell and Evelyn Mitchell with a chart of numbered FCC accounts and requested them to code the checks which FCC had issued by placing the appropriate account number on the corresponding check stubs. Given FCC's inadequate books and records, Bergman was unable to determine the accuracy of their check coding or the true taxable income of FCC. With respect to his own taxable income, Robert Mitchell also failed to maintain adequate records. On March 19, 1975, an information was filed charging Robert Mitchell with willfully and knowingly attempting to evade Federal income tax for the year 1968 in violation of section 7201. On May 2, 1975, Robert Mitchell, upon his plea of guilty, was convicted of willfully and knowingly attempting to evade a large portion of his income tax due for 1968, by preparing signing, and mailing a false and fraudulent return in violation of section 7201. [10]
On March 12, 1976, a notice of deficiency was issued to Robert Mitchell, in which respondent determined that *589 Robert Mitchell had understated his taxable income for the years 1965 through 1969. [11] The following chart shows Robert Mitchell's taxable income as reported on his returns, his taxable income as determined by respondent, and the amount of unreported taxable income determined by respondent: Unreported
Taxable Income
Taxable Income
Taxable Income
Reported by
Determined by
Determined by
Year
Robert Mitchell
Respondent
Respondent
1965
$ 6,162.00
$ 11,154.00
$ 4,992.00
1966
No Return Filed
26,202.00
26,202.00
1967
No Return Filed
125,333.07
125,333.07
1968
9,039.00
122,384.97
113,345.97
1969
10,210.00
98,388.30
88,178.30 On June 13, 1975 and March 12, 1976, notices of deficiency were issued to Robert Mitchell and Evelyn Mitchell for 1971 and 1970, in which the respondent determined that they had understated their taxable income on their joint returns for these years. The following chart shows Robert Mitchell's and Evelyn Mitchell's taxable income as reported on their joint returns, their taxable income as determined by respondent, and the amount of unreported taxable *590 income determined by respondent: Taxable Income
Unreported
Reported by
Taxable Income
Taxable Income
Robert and Evelyn
as Determined
as Determined
Year
Mitchell
by Respondent
by Respondent
1970
$ 11,394.00
$ 30,798.24
$ 14,404.24
1971
16,038.27
57,020.06
40,981.79
On March 12, 1976, a notice of deficiency was issued to FCC for its taxable years ended March 31 of 1967 through 1971, in which respondent determined that FCC had understated its taxable income. The following chart shows FCC's taxable income as reported on its return, its taxable income as determined by respondent, and the amount of unreported taxable income determined by respondent: Unreported
Fiscal
Taxable Income
Taxable Income
Taxable Income
Year
Reported by
Determined by
Determined by
Ended
FCC
Respondent
Respondent
3/31/67
$ (zero)
$ 16,471.49
$ 16,471.49
3/31/68
15,149.82 104,198.83
89,049.01
3/31/69
29,968.46 106,154.51
76,186.05
3/31/70
18,997.33 79,689.59
60,692.26
3/31/71
(12,014.54)
1,023.96
13,038.50 The adjustments that respondent made to petitioners' income can be summarized by the following charts: Robert Mitchell
Adjustment
1965
1966
1967
1. Purported Purchases
$ 5,000.00
$ 14,386.00
2. Ciresi Items
1,286.00
$ 34,265.50
3. Purported Loans
730.00
34,300.00
4. Identified Diverted
Corporate Receipts
7,174.25
5.Unidentified Deposits to
Robert Mitchell's Acct. a
40,473.32
6. Photo-Mail, Inc., Deposits b
7. D & B Auto Lease Items c
8. Frank Spiegel Items
1,500.00
9. Unreported Wage Income
9,900.00
10,720.00
10. Interest Expense d *592 11. Disallowance of Itemized Deductions e
Robert Mitchell
Adjustment
1968
1969
1. Purported Purchases
2. Ciresi Items
$ 20,980.00
3. Purported Loans
33,950.00
$ 13,000.00
4. Identified Diverted
Corporate Receipts
18,056.91
36,608.67
5. Unidentified Deposits to
Robert Mitchell's Acct. a
38,654.06
32,094.64
6. Photo-Mail, Inc., Deposits b
4,474,99
7.D & B Auto Lease Items c
1,930.00
2,000.00
8. Frank Spiegel Items
9. Unreported Wage Income
10. Interest Expense d
11. Disallowance of Itemized
Deductionse
*591 Robert and
Evelyn Mitchell
Adjustment
1970
1971
1. Purported Purchases
2.Ciresi Items
3. Purported Loans
4. Identified Diverted
Corporate Receipts
$ 9,180.89
$ 1,051.15 5. Unidentified Deposits to
Robert Mitchell's Acct. a
4,158.00
20,516.05 6. Photo-Mail, Inc., Deposits b
711.35
4,859.86 7. D & B Auto Lease Items c
8. Frank Spiegel Items
9. Unreported Wage Income
10. Interest Expense d
(14,875.80)
11. Disallowance of Itemized
Deductions e
354.00
FCC
Fiscal Year Ended 3/31 Adjustment
1967
1968
1969
Purported Purchases
$ 14,386.00
Ciresi Items
2,552.00
$ 39,149.50 $ 14,830.00 Identified Diverted
Corporate Receipts
12,725.54 19,114.27 Unidentified Deposits
to Robert Mitchell's
Account a
3,564.10
36,909.22 40,771.56 Photo-Mail, Inc.,
Deposits
D & B Auto Lease Items
1,395.00 4,500.00 Interest Income b *593 (1,130.25)
(3,029.80)
Net Operating Loss
Carry forward
4,030.61
Adjustment
1970
1971
Purported Purchases
Ciresi Items
Identified Diverted
Corporate Receipts
$ 30,000.00 $ 10,232.04 Unidentified Deposits
to Robert Mitchell's
Account a
29,977.14 4,832.31 Photo-Mail, Inc.,
Deposits
4,735.72 2,069.25 D & B Auto Lease Items
Interest Income b
(4,026.60)
(4,095.15)
Net Operating Loss
Carry forward ULTIMATE FINDINGS OF FACT Petitioners underreported income for all years in issue. Part of petitioners' underpayments of tax for each of the years in issue, except 1965, was due to fraud with the intent to evade tax within the meaning of section 6653(b). The statute of limitations bars respondent from assessment and collection of the deficiency determined for 1965. OPINION We must determine whether petitioners are liable for deficiencies and additions to tax as determined by respondent for the years in issue. Issue 1: Deficiencies
Respondent's deficiency determinations carry the presumption of correctness and, therefore, the burden is upon petitioners to prove otherwise. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a). We hold that petitioners have failed to rebut the correctness of the determined deficiencies for all years in issue except 1965. For the sake of clarity, we consider the cases of Robert *594 Mitchell, and Robert Mitchell and Evelyn Mitchell separately from FCC. Robert Mitchell; Robert Mitchell and Evelyn Mitchell
During 1965, respondent contends that Robert Mitchell caused FCC to issue checks totaling $ 5,000 which he converted for personal purposes and did not report as income on his return for 1965. Robert Mitchell has failed to present any evidence to rebut respondent's determination and, therefore, we conclude that Robert Mitchell underreported his 1965 income by $ 5,000. During 1966 and 1967, Robert Mitchell received a salary from FCC of $ 9,900 and $ 10,720, respectively, but he did not file an individual return for such years. Moreover, he ignored the legal requirements to maintain adequate books and records, which were necessary to establish the amount of his gross income. Sec. 6001; sec. 1.6001-1(a), Income Tax Regs. In addition, FCC failed to meet these legal requirements. Where a taxpayer fails to keep adequate books and records and the records kept do not clearly reflect his income, respondent is authorized to reconstruct the taxpayer's income in accordance with such method as in his opinion does clearly reflect income. Sec. 446(b). Respondent's deficiency *595 determinations are based on his position that Robert Mitchell diverted FCC funds for personal purposes and that such funds were not reported as income on Robert Mitchell's returns. Since Robert Mitchell and FCC failed to maintain adequate books and records, respondent's investigation of Robert Mitchell's income for the years 1966 through 1971 [12] required a reconstruction of income from third-party bank records, FCC's canceled checks, and the testimony of Ciresi. Not even Robert Mitchell has claimed that his or FCC's books and records were adequate for establishing their tax liability. Instead, he attempted to disprove respondent's deficiency determinations primarily through his own testimony. We did not, however, find Robert Mitchell to be a credible witness. Furthermore, his self-serving testimony largely consisted of conclusory statements which we do not accept as fact. See South Texas Rice Warehouse Co. v. Commissioner,366 F. 2d 890, 898 (5th Cir. 1966), affg. 43 T.C. 540 (1965), cert. denied 386 U.S. 1016 (1967). With respect to the Ciresi items which totaled $ 56,531.50, Robert Mitchell claims *596 that the monies were used by FCC to purchase merchandise from LLP. Ciresi, however, testified to the contrary. He stated that he cashed the Ciresi items and personally returned the proceeds to Robert Mitchell. Notwithstanding Robert Mitchell's claim that Ciresi was lying, we found Ciresi to be a credible witness. Robert Mitchell could have attempted to corroborate his story by introducing invoices or receipts which showed his alleged purchases from LLP, but he made no effort to do so. Moreover, if FCC did purchase $ 56,531.50 worth of goods from LLP it seems likely that an employee of FCC, other than Robert Mitchell, would have known about it and could have so testified. Robert Mitchell, however, did not call any witnesses to corroborate his self-serving testimony. Robert Mitchell's attempt to disprove respondent's inclusion in income of the purported loan checks was equally unconvincing. [13] *598 Robert Mitchell testified that FCC loaned him amounts in excess of $ 81,000, but the evidence falls far short of establishing that the purported loans received by Robert Mitchell constituted a bona fide indebtedness. Although the record contains twenty-two checks that were coded to FCC's *597 "Notes - Bob Mitchell" account as well as promissory notes which represented this alleged debt, Robert Mitchell admitted that the coding of the checks and the execution of the promissory notes was done after the IRS informed him of its intention to audit him and FCC. On the record before us, we think that the check coding and the execution of the promissory notes were done by Robert Mitchell to create evidence that would support his testimony. Consequently, we are not persuaded by such evidence. Robert Mitchell has also failed to present any credible and complete evidence with respect to the other adjustments made by respondent. Consequently, we uphold respondent's adjustments in docket Nos. 8270-75, 4925-76, and 4926-76.See also Estate of Mason v. Commissioner,566 F. 2d 2 (6th Cir. 1977), affg. 64 T.C. 651 (1975); Mills v. Commissioner,399 F. 2d 744, 749 (4th Cir. 1968), affg. a Memorandum Opinion of this Court. With respect to docket Nos. 8270-75 and 4926-76, petitioners argue that Evelyn Mitchell was an "innocent spouse" and, therefore, should be relieved of liability under section 6013(e). Section 6013(e)(1) provides that: (e) Spouse Relieved of Liability in Certain Cases.-- (1) In General. Under regulations prescribed by the Secretary or his delegate, if-- (A) a joint return has been made under this section for a taxable year and on such return there was omitted from gross income an amount properly includable therein which is attributable to one spouse and which is in excess of 25 percent of the amount of gross income stated *599 in the return, (B) the other spouse establishes that in signing the return he or she did not know of, and had no reason to know of, such omission, and (C) taking into account whether or not the other spouse significantly benefited directly or indirectly from the items omitted from gross income and taking into account all other facts and circumstances, it is inequitable to hold the other spouse liable for the deficiency in tax for such taxable year attributable to such omission, then the other spouse shall be relieved of liability for tax (including interest, penalties, and other amounts) for such taxable year to the extent that such liability is attributable to such omission from gross income.
All three of these elements must be proven by the petitioning spouse in order to gain relief as an innocent spouse. Quinn v. Commissioner,524 F. 2d 617, 626 (7th Cir. 1975); Estate of Jackson v. Commissioner,72 T.C. 356, 360 (1979); Galliher v. Commissioner,62 T.C. 760, 761 (1974). Respondent maintains that petitioners failed to raise the innocent spouse issue in their pleadings and, therefore, the issue was not timely raised. We need not decide whether or not the issue was timely raised because *600 Evelyn Mitchell completely failed to prove that all three elements of section 6013(e)(1) were satisfied. Absolutely no evidence was presented by petitioners on this issue. Accordingly, she is jointly and severally liable for the deficiencies which respondent has determined and we have upheld for 1970 and 1971. Prokop v. Commissioner,254 F. 2d 544 (7th Cir. 1958). FCC
Respondent determined deficiencies in FCC's taxes for each of the fiscal years ended March 31 of 1967 through 1971. Respondent's proposed adjustments to FCC's income essentially attribute to FCC the items already discussed above, and the arguments advanced in behalf of FCC are thus similar to those advanced by Robert Mitchell with respect to his tax liability. Robert Mitchell has largely tried to explain away FCC's deficiencies through his own incomplete, incredible, and self-serving testimony. Nevertheless, the record indicates that FCC claimed deductions for purchases allegedly made, the Ciresi items, and checks issued to Auto Lease.FCC has failed to substantiate its entitlement to such deductions. Moreover, it has also failed to meet its burden of proof with respect to the other adjustments proposed by respondent. *601 Consequently, we uphold respondent's deficiency determinations. Issues 2 and 3: Addition to Tax and the Statute of Limitations
Respondent determined that part of petitioners' underpayment of tax for each year at issue was due to fraud and, therefore, claims that the section 6653(b) fraud addition to tax should be imposed. Petitioners deny that any underpayment of tax was due to fraud. Except for the 1965 taxable year, we hold for respondent on this issue.
The existence of fraud is a question of fact to be resolved upon consideration of the entire record. Gajewski v. Commissioner,67 T.C. 181, 199 (1976). Respondent has the burden of proving fraud for each year that it is alleged by clear and convincing evidence. Sec. 7454(a); Rule 142(b); Cefalu v. Commissioner,276 F. 2d 122, 128 (5th Cir. 1960); Beaver v. Commissioner,55 T.C. 85, 92 (1970). The taxpayer must be shown to have acted with the specific intent to evade a tax believed to be owing. Mitchell v. Commissioner,118 F. 2d 308, 310 (5th Cir. 1941); Estate of Temple v. Commissioner,67 T.C. 143, 159 (1976). Since direct evidence of fraud is seldom available, respondent may meet his burden of proof through circumstantial *602 evidence. Brountas v. Commissioner,73 T.C. 491, 587 (1979); Nicholas v. Commissioner,70 T.C. 1057, 1065 (1978). A taxpayer's failure to satisfy his burden of proof as to the deficiency determined by respondent does not, however, constitute proof of fraud. George v. Commissioner,338 F. 2d 221, 223 (1st Cir. 1964); Pigman v. Commissioner,31 T.C. 356, 370 (1958). With these considerations in mind, we will consider the cases of Robert Mitchell, and Robert Mitchell and Evelyn Mitchell separately from FCC. Robert Mitchell; Robert Mitchell and Evelyn Mitchell
In considering Robert Mitchell's 1965 taxable year, we concluded that he failed to disprove respondent's determination that he underreported his taxable income by $ 5,000. Nevertheless, Robert Mitchell maintains that respondent is barred from assessing and collecting any taxes for 1965 under section 6501(a). For the reasons stated below, we agree with Robert Mitchell. Section 6501(a) sets forth the general rule that the Commissioner must assess tax liability (or issue a notice of deficiency) for a taxable year within 3 years after the return is filed or, if later, the date the return was due to be filed. One of the several *603 exceptions to this rule is that the Commissioner may issue a statutory notice "at any time" to a taxpayer who has filed a false or fraudulent return with the intent to evade tax. Sec. 6501(c)(1). Although the record does not indicate when Robert Mitchell filed his 1965 return, respondent conceded on brief that the action for such year is barred unless section 6501(c)(1) is applicable. Although a shareholder's diversion of corporate funds is tantamount to taxable dividends, respondent has simply not presented clear and convincing evidence that Robert Mitchell diverted to himself $ 5,000 of FCC's funds in 1965. [14] *604 Since the record does not support respondent's claim that Robert Mitchell filed a false or fraudulent return with the intent to evade his 1965 taxes, we hold that respondent is barred from assessing and collecting any deficiency for such year. On the other hand, respondent has established fraud by clear and convincing evidence for each of Robert Mitchell's 1966 through 1971 taxable years. The record reveals several indicia of fraud during those years. A strong indicia of fraud is when a taxpayer has knowledge of his obligation to file a return, but fails to do so. Powell v. Granquist,252 F. 2d 56, 60 (9th Cir. 1958); Gemma v. Commissioner,46 T.C. 821, 834 (1966), appeal dismissed (1st Cir., Feb. 19, 1968). Robert Mitchell failed to file returns for his 1966 and 1967 taxable years even though he has admitted to receiving wages from FCC during such years totaling $ 9,900 and $ 10,720, respectively. Robert Mitchell is a well educated individual and there is no doubt that he knew that he was required to file returns. Moreover, he had filed a return for 1965. The fact that Robert Mitchell filed a return for 1965 coupled with his lack of any credible explanation for his failure to file returns for 1966 and 1967 is clear evidence of fraud. A second indicia of fraud is when a controlling shareholder diverts corporate funds for personal use and fails to report such amounts on his income tax return. Foster v. Commissioner,391 F. 2d 727, 734 (4th Cir. 1968), *605 affg. a Memorandum Opinion of this Court. During 1966, 1967, and 1968, FCC issued the Ciresi items (i.e., 23 checks payable to cash) which totaled $ 56,531.50. Robert Mitchell coded these checks to FCC's "purchases" account and maintains that they were used to buy merchandise for FCC from LLP. Respondent, however, presented clear and convincing evidence that the Ciresi items were diverted for Robert Mitchell's personal use. Respondent called Ciresi as a witness who testified that the proceeds from the Ciresi items were not given to him in exchange for merchandise, but were given back to Robert Mitchell. We found Ciresi to be a credible witness and his testimony indicates that Robert Mitchell falsely coded certain FCC checks to the "purchase" account in order to conceal his own income. These facts are sufficient, by themselves, to show that Robert Mitchell intended to evade tax for the years 1966, 1967, and 1968. Kreps v. Commissioner,351 F. 2d 1 (2d Cir. 1965), affg. 42 T.C. 660 (1964). In addition to the Ciresi items which pertain to Robert Mitchell's 1966 through 1968 taxable years, respondent introduced other evidence which establishes by clear and convincing evidence that *606 Robert Mitchell filed false or fraudulent returns with respect to his 1968 through 1971 taxable years. This other evidence consists of Robert Mitchell's (1) guilty plea to a criminal charge of evading tax due for 1968 in violation of section 7201; (2) diverting FCC funds to purchase securities; (3) diverting FCC receipts to his personal checking account; (4) claiming an interest expense deduction on his 1971 joint return.
As to the taxable year 1968, Robert Mitchell entered a plea of guilty to a charge of willfully and knowingly attempting to evade a large portion of income tax due by preparing a false and fraudulent return for that year in violation of section 7201. Consequently, respondent maintains that Robert Mitchell is collaterally estopped from denying that he filed a fraudulent return for 1968. Strachan v. Commissioner,48 T.C. 335 (1967); Gemma v. Commissioner,46 T.C. 821 (1966).Robert Mitchell, however, argues that a taxpayer who was previously convicted of tax evasion for a particular year under section 7201 should not be estopped in a subsequent civil trial from denying that the return for that year was violative of section 6653(b). To support his argument, he relies *607 on the dissenting opinions in Goodwin v. Commissioner,73 T.C. 215 (1979). We find Robert Mitchell's reliance on these dissenting opinions to be clearly misplaced, and we hold for respondent on this issue. The issue in Goodwin was whether a taxpayer, by reason of a conviction under section 7206(1) with respect to his 1968 through 1970 taxable years was later collaterally estopped from denying that his returns were false or fraudulent with intent to evade taxes. Unlike the case at bar, Goodwin did not involve the civil consequences of a section 7201 conviction, where the term "willfully" as used in such section "has authoritatively been defined in prior judicial decisions to encompass all of the elements of fraud which are envisioned by * * * [the fraud addition to tax] in section 6653(b)." Amos v. Commissioner,43 T.C. 50, 55 (1964), affd. 360 F. 2d 358 (4th Cir. 1965). See also Moore v. United States,360 F. 2d 353 (4th Cir. 1965), modified 1966; Tomlinson v. Lefkowitz,334 F. 2d 262 (5th Cir. 1964); Strachan v. Commissioner, supra;Gemma v. Commissioner,46 T.C. 821 (1966).Moreover, neither of the dissenting opinions in Goodwin took issue with applying collateral estoppel principles *608 to a taxpayer who had previously pled guilty to a section 7201 violation. Consequently, we consider Robert Mitchell's arguments on this issue to be frivolous, and we hold that he is collaterally estopped from denying that he filed a fraudulent return for 1968. Next, we consider Robert Mitchell's diversion of FCC funds to purchase securities. During October 1967, Robert Mitchell and Strok formed an equal partnership, Auto Lease, in order to lease automobiles to FCC. In February 1968, Auto Lease abandoned the car leasing business and began to engage in the sale and exchange of corporate securities through the brokerage firm of Hayden, Miller and Co. Although Auto Lease was a separate entity from FCC, Robert Mitchell caused FCC to issue checks which were used to purchase securities in Auto Lease's name during 1968 and 1969. Robert Mitchell clearly had knowledge of this scheme because he signed all the FCC checks which the company issued, and he negotiated one of the FCC checks to Hayden, Miller and Co.Moreover, Robert Mitchell falsely coded the FCC checks which were used to buy the securities for Auto Lease to FCC's "car rental expense" account, even though they were used to purchase *609 securities for Auto Lease. Since Robert Mitchell held two-thirds of FCC's stock at such time, he should have at least included in income two-thirds of the FCC funds which he diverted to Auto Lease. During 1967 through 1971, the record indicates that several checks payable to FCC were diverted by Robert Mitchell to his personal checking account at the Central National Bank. None of these checks (also referred to as the identified diverted corporate receipts) were included in Robert Mitchell's income for such years. We find that Robert Mitchell's failure to include in income the identified diverted corporate receipts is evidence of fraud with respect to each of the years 1967 through 1970. [15] *610 See Foster v. Commissioner,supra. Finally, we consider the interest expense deduction claimed on Robert Mitchell's and Evelyn Mitchell's joint return for 1971. Robert Mitchell testified that he had incurred and paid interest to FCC on loans that he had obtained from the company.Although Robert Mitchell testified that interest was paid to FCC, there is nothing in the record that corroborates his self-serving testimony.On cross-examination, however, Robert Mitchell admitted that the coding of the purported loan checks to FCC's "Notes - Bob Mitchell" account, and the execution of the promissory notes which represented the alleged loans, were done only after the IRS informed Robert Mitchell of its intention to audit him and FCC. We think the record indicates that Robert Mitchell never intended to enter into a bona fide debtor-creditor relationship with FCC, and that the coding of FCC checks and the execution of promissory notes were simply part of his scheme to divert FCC funds *611 for his own personal purposes. Accordingly, we hold that the claimed interest deduction was fraudulent with intent to evade taxes for 1971. In an effort to limit Evelyn Mitchell's tax liability, petitioners argue that respondent has not established that some part of the underpayment of taxes for 1970 and 1971 was due to the fraud of Evelyn Mitchell. See sec. 6653(b). We disagree. Evelyn Mitchell served as Secretary of FCC during 1970 and 1971, the same years that she filed a joint return with Robert Mitchell. For each of these years, she also received a salary from FCC. Although being an officer of a corporation does not necessarily mean that one has knowledge of that corporation's ongoing activities, respondent has clearly shown that Evelyn Mitchell knew about FCC's operations and that she participated in the preparation of false records. Subsequent to January 29, 1971, the date the IRS notified Robert Mitchell that it planned to audit FCC's taxable years ended March 31 of 1965 through 1970, Evelyn Mitchell assisted her husband in coding FCC's checks in an attempt to create deductible expenses for them (i.e., the claimed interest expense) as well as the corporation. In light *612 of Evelyn Mitchell's position at FCC, her knowledge of FCC's operations, and her participation in the check coding scheme, we believe that respondent has presented clear evidence of fraud. Since Evelyn Mitchell neither testified nor presented any other evidence to rebut respondent's clear evidence of fraud, we find for respondent on this issue. See Bryan v. Commissioner,209 F. 2d 822, 825 (5th Cir. 1954), affg. a Memorandum Opinion of this Court. FCC
Respondent determined that a part of FCC's underpayment of tax for each of the years at issue was due to fraud. We agree with respondent. We have already held that a part of Robert Mitchell's underpayment of tax for each of the years 1966 through 1971 was due to fraud. This holding is relevant with respect to FCC because Robert Mitchell was the controlling shareholder of FCC and respondent's adjustments to FCC's income essentially involve the same items which were included in respondent's adjustments to Robert Mitchell's income. These items primarily consist of funds which were (i) withdrawn from FCC's checking account (i.e., through check-writing schemes discussed supra) or (ii) otherwise diverted away from FCC (i.e., identified *613 diverted corporate receipts). The record indicates that none of respondent's proposed adjustments were included in FCC's returns for the years at issue. Thus, a necessary element of Robert Mitchell's own tax evasion scheme with respect to the Ciresi items and the identified diverted corporate receipts was to intentionally have FCC underreport its taxable income for each of the fiscal years ended March 31 of 1967 through 1971. [16] By pretending that the FCC checks issued to Ciresi (the Ciresi items) and Auto Lease were for business expenses, Robert Mitchell could claim deductible business expenses for FCC and thus conceal its true income during each of its taxable years ended March 31 of 1967, 1968, and 1969.By depositing most of the checks issued by FCC's customers into his personal checking account (i.e., the identified diverted corporate receipts), Robert Mitchell was able to conceal FCC's true income during each of its taxable years ended March 31 of 1968, 1969, 1970, and 1971. The law is clear that the fraudulent activities of a shareholder (i.e., Robert Mitchell) may be imputed to a corporation (i.e., FCC) which he controls and dominates so that the corporation is, in effect, *614 a creature of his will. See Ruidoso Racing Association, Inc. v. Commissioner,476 F. 2d 502 (10th Cir. 1973); Asphalt Industries, Inc. v. Commissioner,384 F. 2d 229, 233 (3d Cir. 1967). Although both Robert Mitchell and Strok were shareholders of FCC, the record clearly indicates that Robert Mitchell was the controlling and dominating force behind FCC. Thus, we believe that Robert Mitchell's fraudulent activities ought to be imputed to FCC for the years in issue. Having found that at least a part of FCC's underpayments of tax was due to fraud for each of the years in issue, we uphold respondent's additions to tax with respect to FCC.See sec. 6653(b). Since we have upheld respondent's determinations with respect to all years in issue except 1965, Decisions will be entered for the respondent in docket Nos. 8270-75, 4926-76, and 4927-76.
Decision will be entered under Rule 155 in docket No. 4925-76. *615 Footnotes
1. Cases of the following petitioners are consolidated herewith: Robert Mitchell, docket No. 4925-76; Robert Mitchell and Evelyn K. Mitchell, docket No. 4926-76; Film Craft Corporation, docket No. 4927-76.↩
2. All statutory references are to the Internal Revenue Code of 1954, as in effect during the years in issue.↩
3. Unless indicated otherwise, all Rule references are to the Tax Court Rules of Practice and Procedure.↩
4. Although the record does not indicate all the details of this transaction, it is clear that Robert Mitchell did not fully pay for Spiegel's FCC stock in 1965.↩
5. @FCC maintained its checking account (no. XXX-213-6 maintained its checking account (no. XXX-213-6) at the Union Commerce Bank of Cleveland, Ohio. All the FCC checks discussed herein were drawn on this account and signed by Robert Mitchell.
6. During the years 1966, 1967, and 1968, Lee-Land Photo, Inc., was engaged primarily in the business of selling cameras and camera equipment at the retail level. ↩
7. This check coding was done both by Robert Mitchell and Evelyn Mitchell. It was done not when the checks were issued, but subsequent to January 29, 1971, the date the Internal Revenue Service notified Robert Mitchell that it planned to audit FCC's taxable years ended March 31 of 1965 through 1970.↩
8. See footnote 7.↩
9. See footnote 7.↩
10. This guilty plea was made in the criminal case of United States of America, Plaintiff v. Robert Mitchell, Defendant,↩ Northern District of Ohio, Eastern Division, Criminal No. CR-75-111.
11. Robert Mitchell did not file returns for 1966 and 1967, and the record does not indicate when he filed his 1965, 1968, and 1969 returns with the IRS.↩
a. This adjustment consists of FCC sales receipts which respondent determined were deposited in Robert Mitchell's account at the Central National Bank. During 1967, 1968, and 1969, Robert Mitchell deposited amounts in excess of $ 40,473.32, $ 38,654.06, and $ 32,094.64, respectively, in such account, and such amounts were not included in income on Robert Mitchell's returns. ↩
b. Respondent determined that the deposits made to Photo-Mail's account were used for the personal benefit of Robert Mitchell. ↩
c. These amounts represent two-thirds of the Auto Lease items for 1968 and 1969. Respondent made this allocation because Robert Mitchell owned two-thirds of FCC's stock at such times. ↩
d. This interest expense was allegedly paid to FCC on the purported loans (Adjustment No. 3, supra↩) that Robert Mitchell received from the company. Since respondent maintains that such loans did not represent a bona fide indebtedness, he has disallowed the claimed interest deduction. e. Represents automatic adjustments.↩
a. This adjustment reflects respondent's determination that the FCC was the source of the unidentified deposits to Robert Mitchell's account and that FCC had never included such amounts in income on its returns. ↩
b. This income represents amounts accrued as interest due from Robert Mitchell on alleged loans to him during FCC's taxable years ended March 31 of 1968 through 1971. Since respondent determined that these loans did not constitute bona fide indebtedness, he decreased FCC's taxable income by the accrued interest income.
12. Robert Mitchell and Evelyn Mitchell filed a joint return for 1970 and 1971.↩
13. Although the record contains twenty-two purported loan checks which were issued by FCC to Robert Mitchell during 1967, 1968, and 1969 totaling $ 34,100, $ 33,950, and $ 13,000, respectively, for such years, respondent has proposed slightly different adjustments. In particular, respondent has proposed purported loan adjustments for 1966, 1967, 1968, and 1969 in the amounts of $ 730, $ 34,300, $ 33,950, and $ 13,000, respectively. Although the record does not include a $ 730 purported loan check issued during 1966, we uphold respondent's determination for such year because Robert Mitchell has failed to prove such determination to the erroneous. For this same reasons, we uphold respondent's purported loan adjustment of $ 34,300 for 1967, even though the purported loan checks for such year that are in the record only total $ 33,950.
14. In attempting to prove that Robert Mitchell fraudulently evaded taxes for years other than 1965, respondent placed in the record copies of several FCC checks and check stubs, along with other evidence, which substantiates his contention. Respondent, however, has made no explanation as to why he did not submit similar evidence with respect to 1965.
15. Although the record is unclear, there is some indication that respondent's identified diverted corporate receipts adjustment of $ 1,051.15 for 1971, should instead have been added to the 1970 adjustment. Nevertheless, we upheld respondent's deficiency determination for 1971 because Robert Mitchell and Evelyn Mitchell failed to overcome its presumptive correctness. A finding of fraud, however, cannot be based on petitioners' failure to overcome the presumptive correctness of respondent's deficiency determination. George v. Commissioner,338 F. 2d 221, 223 (1st Cir. 1964); Pigman v. Commissioner,31 T.C. 356, 370 (1958). Thus, our finding of fraud for 1971 is based on other evidence discussed infra.↩
16. We have carefully reviewed the record and have found that FCC underreported its income for each of the fiscal years ended March 31 of 1967 through 1971 as a result of Robert Mitchell fraudulently omitting the Ciresi items and the identified diverted corporate receipts from its income.↩