**SOUTH TEXAS RICE WAREHOUSE CO., Petitioner,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent.**

**No. 22834.**

United States Court of Appeals
Fifth Circuit.

Aug. 22, 1966.

Rehearing Denied Oct. 4, 1966.

Homer L. Bruce, William C. Griffith, Robert J. Piro, Houston, Tex., Baker, Botts, Shepherd & Coates, Houston, Tex., of counsel, for petitioner.

John B. Jones, Jr., Acting Asst. Atty. Gen., Lee A. Jackson, Atty., Dept. of Justice, Mitchell Rogovin, Chief Counsel, Hu S. Vandervort, Atty., I.R.S., C. Moxley Featherston, Acting Asst. Atty. Gen., Fred R. Becker, Harry Baum, Attys., Dept. of Justice, Washington, D. C., Richard M. Roberts, Acting Asst. Atty. Gen., for respondent.

Before RIVES and BELL, Circuit Judges, and FULTON, District Judge.

RIVES, Circuit Judge:

This is a companion case to Davant v. Commissioner of Internal Revenue, 366 F.2d 874 (5 Cir. 1966). While this case and Davant contain certain common issues of fact, they each involve distinct questions of law. For that reason we have elected to write separate opinions. The Tax Court held that the Commissioner did not abuse the discretion conferred by section 482 [1] when he reallocated certain income between South Texas Rice Warehouse Company,[2] the petitioner in this case, and a partnership formed for the purpose of operating the assets of Warehouse. 43 T.C. 540 (1965). We affirm.

The stock in Warehouse was owned by four families, each possessing a one-fourth interest. Within each family unit there was varied division of stock among family members. Warehouse owned drying and storage facilities used to process rice. The rice dried and stored by Warehouse came primarily from land owned by the four families' interests and worked by sharecroppers.[3]

The original storage facilities built in 1936, compared to present day structures, were somewhat primitive. The rice was stored in sacks and was not artificially dried. About 1949 Warehouse constructed a rice dryer and bulk storage facility. Additional bulk storage buildings and machinery were added in 1951 and 1955. A 65,000 barrel bulk storage area costing $165,748.48 was built in 1957. Minor improvements were added throughout the remaining tax years here in question.[4]

In May of 1957, R. Q. Pegram, Jr., E. W. Clark, Thurman S. Clements, and John E. Davant consulted Homer L. Bruce, Esq., an attorney who had represented Warehouse and the four families for many years. They asked whether a partnership could be formed for the purpose of leasing and operating the assets of Warehouse. Bruce told them that this could be done if a reasonable rent was paid for the use of Warehouse's operating assets.

South Texas Rice Enterprises,[5] a partnership, was formed about June 1, 1957. The managing partners borrowed between $15,000 and $20,000 to initiate the partnership, but no other initial capital investment was made.[6] Enterprises, like Warehouse, was owned by the same four families with each family receiving a

---

1. All section references are to the Internal Revenue Code of 1954.

2. Hereafter, Warehouse.

3. As a general rule, in addition to the rice received as rent and processed through Warehouse, the co-tenants or sharecroppers also dried and stored their rice in Warehouse's facilities. Some rice from independent sources was also dried and stored in Warehouse's facilities. For the relationship of the families' various interests, see our opinion in Davant v. Commissioner of Internal Revenue, 366 F.2d

874 (5 Cir. 1966). See also the opinion of the Tax Court. 43 T.C. 540 (1965).

4. The Commissioner seeks to attribute $30,000 of the partnership's income to Warehouse as rent for each of the fiscal years ending June 30, 1958, 1959 and 1960.

5. Hereafter, Enterprises.

6. Another of the families' corporate entities was authorized to guarantee loans to the partnership should that have become necessary.

one-fourth interest.[7] The two older Clements were no longer active in the business. Their shares in the partnership were given to their children, who were active. There was also a slight variance in the distribution of ownership within the Pegram family.[8]

A meeting was held in Mr. Bruce's office at which it was agreed that $4,000 per month would be paid as rental by Enterprises to Warehouse for use of its operating assets.[9] On July 1, 1957, E. W. Clark acting for both Warehouse and Enterprises signed the lease agreement. The lease was for one year with Enterprises given the right to extend the lease one year at a time for two successive years. In June 1960 Warehouse and Enterprises executed another lease substantially the same as the first, except that the rent was raised to $4,-166.66 per month in order to reflect new improvements made by Warehouse.

Enterprises, like Warehouse, before the leases, was a very successful business venture. The leases, however, separated the entity that was depreciating [10] the assets from the entity that was receiving the income occasioned by operating the assets. Because of this separation and the fact that the rent paid by Enterprises was not sufficient to

| 7 | | Percent of stock in Warehouse | Percent of ownership of Enterprises in | | Percent of family ownership in each |
|---|---|---|---|---|---|
| Individuals | | | 1957 | 1958–1960 | |
| 1. L. D. Clements | | 20 | | | 25 |
| 2. Thurman S. Clements | | 2-1/2 | 12-1/2 | 12-1/2 | |
| 3–4. Betty Dickson Clements Fly and William S. Fly | | 2-1/2 | 12-1/2 | 12-1/2 | |
| 5. John E. Davant | | 7-6/7 | 10-5/7 | 7-6/7 | 25 |
| 6. Hortense E. Davant | | 2-6/7 | 0 | 2-6/7 | |
| 7. Mary Anne Davant Dunnam | | 7-1/7 | 7-1/7 | 7-1/7 | |
| 8. Kathryn Davant Dodson | | 7-1/7 | 7-1/7 | 7-1/7 | |
| 9. S. M. Clements | | 15 | | | 25 |
| 10–11. Marienne Clements Clark & E. W. Clark | | 10 | 25 | 25 | |
| 12. Raye W. Pegram | | 8 | 5 | 5 | 25 |
| 13. R. Q. Pegram, Jr. | | 8 | 5 | 5 | |
| 14. Joyne Pegram Jones | | 3 | 5 | 5 | |
| 15. Peggy Pegram Elliott | | 3 | 5 | 5 | |
| 16. Ray Beth Foster | | 3 | 5 | 5 | |

The persons whose names are indented in the foregoing tabulation were children of the first-named person in the family, except that John E. Davant was the brother of Kathryn Davant Dodson and Mary Anne Davant Dunnam and the nephew of Hortense E. Davant.

* * *

8. The partnership was formed for the purpose of letting the Clements families' children receive a larger part of the income generated by the rice drying and storage business. Each of the older Clements told his children that they could have the family's full one-fourth of the partnership if they wanted it.

9. The Tax Court found that the negotiations at this meeting were not arms-length but were merely for the purpose of giving the appearance that a full, fair and reasonable rent was being charged.

10. The amounts deducted by Warehouse for depreciation, amortization or other business expenses are shown in the opinion of the Tax Court. 43 T.C. at 549.

cover Warehouse's book expenses, Warehouse showed a yearly loss. Warehouse attempted to carry this loss back to previous years and filed a return asking for a tax refund. The Commissioner objected, taking the position that under section 482 Enterprises' income and expenses should be attributed to Warehouse. In the alternative, the Commissioner contended that the rent paid for Warehouse's assets was insufficient. Under section 482 the Commissioner sought to attribute sufficient income from Enterprises to Warehouse to constitute what the Commissioner conceived to be a reasonable rent, i. e., $78,000.

The Tax Court found against the Commissioner on his first contention. No appeal having been taken from this part of the Tax Court's opinion, we can give the Commissioner no relief. The Tax Court did, however, find for the Commissioner on his alternative argument that $78,000 was a reasonable rent.

■ Warehouse contends that the Tax Court erred because section 482 should not apply in this case and because $48,000, not $78,000, was a reasonable rent. Section 482 reads as follows:

"In any case of two or more organizations, trades, or businesses (whether or not incorporated, whether or not organized in the United States, and whether or not affiliated) owned or controlled directly or indirectly by the same interests, the Secretary or his delegate may distribute, apportion, or allocate gross income, deductions, credits, or allowances between or among such organizations, trades, or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of such organizations, trades, or businesses."

Two elements must coalesce for the Commissioner to use his section 482 power: 1) The businesses must be under *common control*. 2) The reallocation must be necessary to *reflect* the *proper income* of the businesses or *prevent tax evasion*.

■■ We agree with the Tax Court that these businesses were under common control. The statute applies whether the control is direct or indirect. Viewed in the broadest sense, both Enterprises and Warehouse were owned by exactly "the same interests." Each family as a unit retained its 25% interest in the income generated by the businesses. Individuals who owned 65% of Warehouse's stock owned all of Enterprises'. The only two persons who did not participate in both were the older Clements. Under the circumstances of this case, we do not believe that their lack of absolute control over the assets involved for periods not in excess of three years was sufficient to defeat the operation of section 482.

■ The purpose of forming Enterprises was to effect a short-term reallocation of income among the family members of certain units without in any way affecting their long-term ownership or control. The Tax Court found (43 T.C. at 560):

"This partnership was not a sham. It was organized for the business purpose of transferring to the adult children of L. D. and S. M. Clements, the fathers' interest in the rice drying and warehousing operation, while permitting the fathers to retain their ownership interests in the physical properties."

In this statement the Tax Court was only half right. Certainly the partnership was not a sham in the sense that it made only a fleeting appearance as a shield for some other transaction. The partnership was a real functional entity intended to last at least from one to three years.

But whether the intention to shift income within a family unit is a "business purpose" justifying its recognition as a distinct noncontrolled business entity must be judged by the statutory function of section 482. The entire purpose of section 482 is to prevent the use of two organizations to distort income or avoid taxes. That purpose would be frustrated if a short-term diversion of income were sufficient to defeat a

finding of control where the shift is among related family members and no change takes place in the actual ownership of the "physical properties."

■ Warehouse argues that the income involved in this case was really generated not by the "physical properties" involved but by the diligent efforts of those managing the business. In this way it is argued that no distortion of income took place and that there is really no identity of ownership of the income generating properties. This argument misses the mark. Not all of those receiving income through either Warehouse or the partnership actually took part in their management. What is more important is that the argument depends upon what is a fair salary for the executives running the business enterprise. Even if all of Enterprises' income were attributable to Warehouse, under section 482 Warehouse would be entitled to deduct reasonable salaries for its and Enterprises' employees. The question here is whether splitting the distribution of income generated by this business from the entity that retained ownership of the assets can be used to create a tax loss and to receive a refund of back taxes.

Moreover, this record does not show that it was the extraordinary effort of any one individual as opposed to the operating assets of Warehouse and its accumulated good will that generated the income in question. We cannot say that a three-year reallocation of income approved by the elder Clements with a donative intent brought the type of

break in continuity of interest or control that would prevent the application of section 482 in this case. See Advance Machine Exch. v. Commissioner of Internal Revenue, 196 F.2d 1006 (2 Cir. 1952), cert. den., 344 U.S. 835, 73 S.Ct. 45, 97 L.Ed. 650. Cf. Section 673; also compare Commissioner of Internal Revenue v. Owens, 69 F.2d 597 (5 Cir. 1934).

■ Warehouse further argues that the requisite common control could not exist, because under Texas law [11] 80% of the stockholders must approve a lease of substantially all of a corporation's assets. The partners of Enterprises owned 65% of Warehouse's stock. Thus at all relevant times they were in effective control of Warehouse, with but one possible exception. That exception is the moment at which Warehouse leased all of its operating assets to Enterprises. If we test control at that moment, the case for the Commissioner is even stronger. Rather than negating an inference of control, the fact that the two elder Clements could veto any reallocation of income even for the short three-year period by blocking the lease of Warehouse's physical properties demonstrates the degree to which the assets involved were to be controlled as they desired.[12] The only change occasioned by the introduction of the partnership was in who received the income; the business was carried on essentially as before. Such a change of form designed solely to alter the allocation of income in the short run is not the proper occasion for allowing a tax loss to be created by splitting depreciation from income.

11. Article 5.10 of the Texas Business Corporation Act, V.A.T.S. requires "the affirmative vote of the holders of at least four-fifths of the outstanding shares of the corporation" to approve the lease.

12. The Tax Court noted (43 T.C. at 526): "Under the facts of the instant case, that common control of Warehouse and Enterprises existed is shown not only by the relationship of father and child with respect to the stockholders in Warehouse who permitted their family interest in the partnership to be taken over by their children but also by the fact that the en-

tire operations of Enterprises were dependent on the over-all family interests in various business entities. Obviously, for Enterprises to operate its rice drying and warehousing business, it was necessary that it not only have the lease of the dryer and warehousing facilities of Warehouse but also have available to put through its dryer the rice produced by Rice Farms on lands irrigated and leased from Water Co. Water Co. and Rice Farms were owned by the same individuals who owned the stock in Warehouse."

■ Lastly, it is argued that these businesses should be viewed as distinct, uncontrolled enterprises because the partnership had real and distinct liabilities. Chief among these was the $48,000 per year rent that it owed to Warehouse whether or not it had a profitable year. It should be remembered that the partners were practically paying 65% of this rent to themselves as stockholders of Warehouse. Given the family relationship and the fact that the elder Clements had agreed to the lease so that their children could get a larger part of the business income, we conclude that the Tax Court did not err in discounting this factor.

To repeat, under section 482 control may be indirect as well as direct. As to the family units in the instant case, there was complete identity of control of both entities at all times. As to the individuals, the circumstances of this case require us to find that the three-year lease to related persons does not so interrupt the individuals' control as to prevent the operation of section 482. In the instant case individuals owning 65% of Warehouse's stock owned Enterprises. Within this family context, this is substantial identity of control viewed in the light of the purpose of section 482. These three factors taken together amply support the Tax Court's finding of control.

■ The only question remaining is whether the use of Enterprises distorted Warehouse's income so that reallocation is necessary to prevent tax avoidance or to properly reflect income. We agree with the Tax Court that this requisite of section 482 was also fulfilled. Warehouse argues that the lease terms were reasonable and, since $4,000 a month or $48,000 a year was a reasonable rent,

that no reallocation of income is necessary. Accepting petitioner's premise that if $48,000 were a reasonable rent Warehouse would be removed from the reach of section 482, we agree with the Tax Court that $78,000, and not $48,000, was a reasonable rent.

The Tax Court found that the physical properties leased to Enterprises were worth $700,000. Originally the records in this case and the *Davant* case were to be printed as a single record on appeal. However, as a convenience to respondent, the Court granted permission to print them separately. As a result a strange dichotomy developed in the argument of the two cases. In this case Warehouse attacks the Tax Court's finding that the physical properties of Warehouse were worth $700,-000, while in *Davant* the petitioners struggle to insure that it will be sustained. Like ourselves, the Tax Court was bothered by this dual argument. Taking the record in this case alone there was little if any evidence showing the assets to be worth less than $700,-000,[13] while there was sufficient evidence that they were worth at least $700,000.

In the instant case, Enterprises received more than the physical property of Warehouse, it actually received over 20 years of good will accumulated by Warehouse. Its primary source of supply was another family-owned entity that rented riceland on a share-crop basis.

Prior to the lease, in fiscal years 1955, 1956 and 1957 Warehouse's net income was respectively $130,710.77, $171,021.42 and $75,594.29. Enterprises' respective net income [14] for 1957, 1958, 1959 was $127,400.12 (from July 1, 1957—December 31, 1957), $75,967.89, $109,978.13.[15] As a result of confining the income to Enterprises, Warehouse showed a loss

---

13. Mr. Clark at one time estimated the value of the assets as about $600,000.

14. Enterprises' gross receipts, prior to paying its $4,000 per month rent and other expenses, were much higher than its net income. For example, from July 1, 1957 to December 31, 1957 Enterprises had gross receipts of $219,577.96.

15. Had the entity Enterprises not been used during this period, Warehouse would have had net profits of $151,400.12 (from July 1, 1957-December 31, 1957), $123,967.89, $157,978.13. This figure is reached by adding back the rent paid to Warehouse which was deducted in arriving at Enterprises' net profits.

of $33,041.82 in 1958, $18,011.68 in 1959, and $12,389.30 in 1960.[16]

The Tax Court suggested a number of ways to compute a reasonable rent. One witness had heard of a small drying facility on the periphery of the rice-growing area that rented its properties for 10 cents per barrel of rice dried. During 1940 Warehouse had leased its less sophisticated storage facilities for one year at a rental of $50,000.[17]

The Tax Court indicated that if Enterprises rented just Warehouse's drying facilities at a 10 cent per barrel dried rent, it would have paid approximately a $28,000 per year rental. If Enterprises also rented Warehouse's storage facilities for $50,000, the total rent would be approximately $78,000.[18]

Warehouse points out that the 10 cent per barrel rental referred to was not one where there was an absolute liability, as here. That is to say, here Enterprises must pay $48,000 per year rent whether it dries rice or not, while there if no rice was dried no rent was paid. For the reasons stated earlier when we discussed the element of control, we do not think that the absolute $48,000 rental alters this case. Nor would a rental of $78,000 for property and good will worth in excess of $700,000 be inherently unreasonable.

Nothing in this record explains why a corporation which enjoyed the earnings record of Warehouse and which could have enjoyed the earnings record of Enterprises would, just after completing a new storage facility costing over $165,000, lease its properties for $48,000 per year, a sum not sufficient to cover its fixed book expenses. The conclusion is inescapable, that if Enterprises' income were not going to family members the lease would not have been consummated, i. e., no independent party could have negotiated such a lease in an arms-length transaction.

Warehouse emphasizes that rice drying is a risky business and that a storm might destroy the entire rice crop. Thus, it says, $48,000 is a reasonable rent. This assumes that the family actually would force collection of the rent regardless of industry conditions. For the reasons we have stated before, the Tax Court did not err in discounting this factor. The earnings record of Warehouse and Enterprises also belies this contention. When Enterprises was created, the purpose was to reallocate income. Both Warehouse and Enterprises faced the same risks and there is no reason to allow this entity under the circumstances of this case to be used to create a tax loss and refund of income by artificially severing depreciation and amortization from the income generated by operating the business.

■ Warehouse had the burden in the Tax Court of proving that $78,000 was not a reasonable rent. It also had the burden of proving what was a reasonable rent if $78,000 was not reasonable. The weight and sufficiency of the Commissioner's evidence is challenged by petitioner who also argues that it has carried its burden.

■ Warehouse argues that the government put on no evidence of its own and that the partners and their "expert" testified that $48,000 was a fair rental. From this we are to conclude that the Tax Court as a matter of law could not find to the contrary. See J. H. Robinson Truck Lines v. Commissioner of Internal Revenue, 183 F.2d 739 (5 Cir. 1950) (where no evidence to the

---

16. Thus a $123,967.89 net profit on the drying and storing business was turned into a $33,041.82 loss in 1958 and a $157,978.13 net profit was turned into a $18,011.68 loss in 1959. (It should be noted that these figures do not adjust for the variance in fiscal years.)

17. This lease was made before Warehouse built any drying facilities or added the more modern storage facilities involved in its lease to Enterprises.

18. For a more detailed explanation of this method of computing Enterprises' rent, see the opinion of the Tax Court. 43 T.C. 540 at 550–551 (1965).

contrary, the Tax Court must decide for petitioner). We think the rule is otherwise. Judge Hutcheson in Hightower v. Commissioner of Internal Revenue, 187 F.2d 535, at 536 (5 Cir. 1951), distinguished his opinion in J. H. Robinson Truck Lines, and this Court had occasion to reexamine the problem in Burford-Toothaker Tractor Co. v. Commissioner of Internal Revenue, 192 F.2d 633 (5 Cir. 1951).

In *Burford* the petitioner called four witnesses who gave their opinions and the Commissioner called none. This Court said (192 F.2d at 635):

> "In the present case in addition to the opinions of the witnesses there was factual evidence from which reasonable inferences could be drawn. * * *
>
> * * * * * *
>
> "The Tax Court was not concluded by the opinions of the witnesses."

We think the rule is clear, the Tax Court is not bound by the conclusory statements of any witness, even an "expert." The Court must look at the substance of a witness' testimony as well as his conclusions. The testimony must be weighed along with all other relevant evidence. Here the Tax Court pointed out that the witnesses overlooked several significant factors in reaching their conclusions. The Commissioner relied on the testimony adduced from petitioner's witnesses both during direct and cross-examination and the other evidence in the record. The only question is whether the Tax Court's finding that $78,000 was a reasonable rental was clearly erroneous in view of all of the evidence in this record. San Marco Shop, Inc. v. Commissioner of Internal Revenue, 223 F.2d 702 (5 Cir. 1955); Burford-Toothaker Tractor Co. v. Commissioner of Internal Revenue, 192 F.2d 633 (5 Cir. 1951), cert. den., 343 U.S. 941, 72 S.Ct. 1033, 96 L.Ed. 1347 (1952); Stein v. Commissioner, 322 F.2d 78 (5 Cir. 1963); Golden Const. Co. v. Commissioner of Internal Revenue, 228 F.2d 637 (10 Cir. 1955); Oswald Co., Inc. v. Commissioner of Internal Revenue, 185 F.2d 6 (7 Cir. 1950).

 Taking this record as a whole, we cannot say that the Tax Court's factual finding that $78,000 was a reasonable rental was clearly erroneous. The purpose of section 482 is to prevent just such tax avoidance or income distortions as occurred here.[19] Hall v. Commissioner of Internal Revenue, 294 F.2d 82 (5 Cir. 1961); Tennessee Life Insurance Co. v. Phinney, 280 F.2d 38 (5 Cir. 1960); Grenada Industries, Inc. v. Commissioner of Internal Revenue, 17 T.C. 231 (1951), aff'd, 202 F.2d 873 (5 Cir. 1953), cert. den., 346 U.S. 819, 74 S.Ct. 32, 98 L.Ed. 345; Advance Machine Exch. v. Commissioner of Internal Revenue, 196 F.2d 1006 (2 Cir. 1952), cert. den., 344 U.S. 835, 73 S.Ct. 45. The opinion of the Tax Court is therefore

Affirmed.

---

19. When the same persons control two or more entities they may cast their transactions between those entities in any form that they desire. The restraining force of outside interests is absent. Section 482 is designed "to prevent evasion of taxes" or distortion of income caused by the form that these persons choose in casting their transactions.