PIGGY BANK STATIONS, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent; PIGGY BANK INC. AND SUBSIDIARIES, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Piggy Bank Stations, Inc. v. Commissioner
Docket Nos. 1471-79, 1549-79.
United States Tax Court
T.C. Memo 1983-668; 1983 Tax Ct. Memo LEXIS 122; 47 T.C.M. (CCH) 247; T.C.M. (RIA) 83668; November 3, 1983. *122 Held: This Court's holding in original opinion confirmed on the basis of the additional evidence received upon reopening the record. Towner Leeper and David Leeper, for the petitioners. David W. Johnson and Ana G. Cummings, for the respondent. WHITAKER
SUPPLEMENTAL MEMORANDUM FINDINGS OF FACT AND OPINION WHITAKER, Judge: On June 28, 1982, we entered our Memorandum Findings of Fact and Opinion and on June 29, 1982, a decision was entered in each docket. Thereafter, petitioners filed motions to vacate decision and for reconsideration of findings of fact and opinion, together with motions for review by the full Court or for a rehearing. By order dated August 5, 1982, the motions to vacate decision in each docket were granted. By order dated August 13, 1982, petitioners' motions for review by the full Court were denied. By order dated January 26, 1983, the record was reopened for further testimony by deposition, limited, however, to the issue described in our Memorandum Findings of Fact and Opinion as the "Category II Bad Debts" issue, thus granting petitioners' motion for reconsideration of the findings of fact and opinion and *123 for rehearing as to said Category II Bad Debts issue only and denying said motions as to all other issues. This issue involves the claimed bad debt deduction of Piggy Bank Land Company (Land) in its return for its short fiscal year ending March 31, 1976, in the amount of $8,500 and the claimed bad debt deduction of Piggy Bank Stations, Inc. (Stations), in its return for its short fiscal year ending March 31, 1976, in the amount of $244,870.35. [1] The record on the original hearing, including the original and supplemental stipulations and our June 28, 1982, Memorandum Findings of Fact and Opinion are incorporated hearing by reference. The facts set forth in the stipulation of facts on deposition are found as stipulated, respondent's several objections being overruled. The Supplemental Findings of Fact and Opinion with respect to our reconsideration of Category II Bad Debts issue are combined for convenience. Stations' Category II *124 Bad Debts
Based on the supplemental evidence, we find that the Category II Bad Debts deduction in the amount of $244,870.35 is composed in part of construction advances made by Stations to Browne & Klink (B & K) in connection with the construction or modification of filling stations and as a new issue [2] in part of funds transferred by Stations to B & K for use by B & K in its general land development business, as distinguished from its work on filling stations for Stations or Land. [3] The original record failed to disclose the fact of this second purpose for some of the advances or transfers of funds to B & K. In the supplemental record there is no evidence which would allow us to determine or even to estimate that portion of the aggregate Category II amount which is referable to each of these two purposes. Such determination would be essential in order for us to find for petitioners on this aspect of the Category II Bad Debts issue and thus for the reasons set forth below we here reaffirm our holding for respondent upon the construction advance aspect of the issue. Whether or not funds transferred by Stations to B & K for use in the general land development business of B *125 & K constituted an indebtedness which became worthless upon the insolvency of B & K would in any event be far from clear even if there were sufficient facts to enable us to segregate the amounts. [4]
*126 There is testimony that demand notes were executed by B & K and presumably delivered to Stations, but the evidence as to notes is too indefinite and incomplete to enable us to make any finding with respect thereto. [5] The transfer of funds by Stations to B & K for use in B & K's general land development business presents entirely distinct considerations from the construction advances made in connection with the construction or modification of filling stations. Since we do not have evidence as to the aggregate amounts advanced for B & K's general land development business or any facts as to circumstances under which any specific transfer of funds was made by Stations for either purpose, [6] there is simply no basis on this record for our consideration of this new issue. To the extent, therefore, that some portion of the Category II amount of $244,870.35 may have involved funds transferred by Stations to and used by B & K for its general land development business, petitioners have failed to carry their burden of proof that such amounts constituted an indebtedness which was properly charged off during Stations' 1976 fiscal year. Rule 142(a), Tax Court Rules of Practice and Procedure; *127 Welch v. Helvering,290 U.S. 111 (1933). Some portion of the Category II amount *128 unquestionably was transferred by Stations to B & K as construction advances in connection with the modification, construction, reconstruction or equipping of one or more filling stations for operation by Stations. Filling stations were acquired under verying arrangements. Some stations were constructed on land owned by either Stations or Land and in other instances on land leased from third parties. B & K did not take title to land on which a station was to be built. Where land was leased, in some instances a complete filling station had to be constructed by Land or Stations. In other instances, the land and a structure were leased, but equipment had to be installed and possibly the structure modified or renovated. In some instances, the landlord turned over a completed property which may or may not have been constructed by B & K. In other instances, the lessee leased the land, the building and some equipment but other equipment had to be installed by Stations or Land. In all but one instance, work involved in completion of the filling stations was done by B & K as the general contractor. The work was done pursuant to a "cost-plus contract" which provided that Stations or Land *129 would pay for the actual costs incurred by B & K plus 10 percent of the costs for its profit and 5 percent of the costs to reimburse B & K for administrative expenses. Construction money was advanced to B & K apparently as construction progressed, which we judicially know to be a customary arrangement in the construction industry. B & K and Land or Stations, as appropriate, recorded these construction advances on their respective books as accounts receivable. [7] That bookkeeping treatment is not, however, sufficient to create a bona fide indebtedness between the parties. Road Materials, Inc. v. Commissioner,407 F. 2d 1121 (4th Cir. 1969), remanding on other grounds a Memorandum Opinion of this Court; Nassau Lens Co. v. Commissioner,308 F.2d 39, 46 (2d Cir. 1962), remanding 35 T.C. 268 (1960). A construction advance, sometimes referred to as a "progress payment," in a cost plus a fixed fee contract is designed to reimburse the general contractor pro tanto for at least a part of his out-of-pocket costs and/or *130 his fee. Frequently, such advances are made against an architect's or engineer's certification as to the progress of work and payment for labor and materials. While the contractual arrangements between B & K and Stations or Land appear to have been less formal than is customary and the contracts probably oral rather than written, we must assume, in the absence of evidence to the contrary, that the arrangements between the owner and contractor in general followed the normal pattern, which clearly is acccepted and followed in the State of Texas. We agree with the State that the word "advance," in its strictly etymological significance, has an ordinary, common and well known meaning in both common parlance as well as in the commercial world. It indicates money was paid before or in advance of the proper time for payment, and implies a looking forward to a time when the money will be due the recipient. * * * ( Keagan v. State,618 S. W. 2d 54, 57 (Tex. Crim. App. 1981).) See also 2 C.J.S. Advance (1972). The supplemental record clarifies the original record in that *131 permanent financing of the filling station costs was obtained, when obtainable, either by Stations or Land but not by B & K. We are not informed as to the mechanics pursuant to which the permanent financing so obtained resulted in reduction or elimination of the receivable on the books of B & K referable to a particular filling station. However, there was no intent on the part of B & K that such advances, whether made by Stations or Land, would create a debt to be repaid by B & K. [8]
*132 B & K's repayment obligation was limited to those funds transferred to it for use in its general land development business--the new issue. It is obvious, and the Court judicially knows, that construction advances made by an owner to a general contractor in a cost-plus contract arrangement do not and cannot create any indebtedness by the general contractor to the owner in normal circumstances. To the extent that the aggregate of construction advances under such a contract do not exceed cost plus the agreed upon fee, and the contractor completes construction in accordance with the contract, the construction advances simply represent advance payments, i.e., payments as the work progresses, to the contractor of the agreed upon consideration, the contractor's costs plus the fee. It is at least theoretically possible for an owner to over-advance under a cost-plus contract in which event the contractor would have an obligation to refund the excess moneys. Also, a breach of contract such as by failure of the general contractor to complete could result in an obligation to restore to the owner construction *133 advances in whole or in part. However, there is no evidence in this record which even hints at any such factual situation. The supplemental record simply confirms the conclusion reached by us in our original opinion that no part of the Category II bad debts referable to filling station work (the $8,500 balance on Land's books and that portion of the $244,870.35 in Stations' books referable to construction advances) arose out of an indebtedness of B & K to Stations or Land. We, therefore, confirm our holding for respondent on this issue in each docket. Petitioners have inserted into the record evidence as to the audit of Sam and Vona Klink and of the B & K partnership, which resulted in a petition pending in this Court by Mr. and Mrs. Klink, docket No. 6443-80. This evidence forms the basis for petitioners' argument that respondent has taken inconsistent positions, thereby canceling the normal presumption of correctness attached to the statutory notice in this case. The inconsistency arises out of the fact that in these consolidated cases respondent disallowed the bad debt deduction claimed by Stations and Land for advances to B & K on the grounds, among others, that no indebtedness *134 existed, whereas in docket No. 6443-80, respondent did not challenge the existence of the B & K debt as claimed by the partnership but instead asserted that its write-off resulted in income to B & K, thus challenging the insolvency of B & K. Petitioners rely on Helvering v. Taylor,293 U.S. 507 (1935); Meyer v. Commissioner,46 T.C. 65 (1966); Nat Harrison Associates, Inc. v. Commissioner,42 T.C. 601 (1964); and Doggett v. Commissioner,66 T.C. 101 (1976). Petitioners' reliance upon these cases is misplaced. Respondent is not seeking to tax the same income twice. To the extent that the position of respondent in docket No. 6443-80 may be said to be inconsistent with his position in these dockets, and it is certainly not inconsistent within the language of our opinion in Doggett v. Commissioner,supra at 104, we find respondent's positions to be reasonable, with no shadow of the type of arbitrary and capricious action which the Court in Helvering v. Taylor,supra, criticized. Neither the burden of proof nor the burden of going forward with the evidence is shifted *135 to respondent in this case. By reason of respondent's concession in Piggy Bank Stations, Inc., docket No. 1471-79, decision in that docket will be entered under Rule 155.
In the case of Piggybank, Inc. and Subsidiaries, docket No. 1549-79, decision will be entered for the respondent.
Footnotes
1. Stations' total bad debt deduction for fiscal year 1976 was $347,529, of which $26,424 was conceded by respondent, $55,234.65 was described by us in our June 28, 1982, opinion as Category I Bad Debts, and $21,000 as Category III Bad Debts.↩
2. There is an obvious question as to the propriety of raising this new issue on this supplemental hearing but we have, nevertheless, given it all the consideration which the record allows. ↩
3. Stations was in the business of operating gasoline filling stations, some of which it owned, some of which were owned by Land and leased to Stations, and some of which were leased by Stations from third parties. B & K was engaged in various land development projects and as a relatively small part of its business in designing, building or modification of gasoline filling stations for Stations and Land, as well as locating potential sites therefor and negotiating the acquisition of sites for Stations and Land. ↩
4. At various times, B & K participated in the early developmental stages of two shopping centers, one known as the West Town Shopping Center and the other as the McRae site. Petitioners argue that Stations' loans to B & K to provide funds for land development for shopping centers such as these had a business purpose from Stations' standpoint since B & K hoped to be able to "spin off" to Stations' sites for filling stations. Again, however, no specific advance is linked to any acquisition by B & K of an interest in a potential land development site out of which a potential filling station location was spun off or even designated on a development plan for filling station usage. For example, a feasibility study procured by B & K with respect to the proposed West Town Shopping Center recites that no provision is made for convenience stores or service functions which would be constructed on the fringes of the area, but fails to even mention filling stations as one of the illustrations of a fringe business. Klink did testify that a corner in the McRae site was transferred to "Piggy Bank" but the record is silent as to the date of the occurrence, whether a filling station was constructed or the relationship between one or more advances to B & K and the acquisition of the McRae site. We simply cannot base a finding of business purpose for a series of loans on vague, self-serving testimony such as this. See South Texas Rice Warehouse Co. v. Commissioner,366 F.2d 890, 897 (5th Cir. 1966), affg. 43 T.C. 540 (1965), cert. denied 386 U.S. 1016↩ (1967). We also commented in our original opinion on the apparent free use by Mr. Klink of funds of Stations and Land for any purpose of interest to Mr. Klink.
5. There was no evidence in the original hearing as to such notes and in fact no suggestion that some part of the $244,870.35 represented transfers of funds for use by B & K for its general business purposes. No notes were produced during the deposition or included in the record and there is no evidence as to dates, amounts or the disposition of any notes. Moreover, the deponent, Sam Klink, was himself unsure of the timing of the execution of notes and whether the notes included both advances for filling station construction and for other B & K business or only the latter. In any event, such notes, to the extent they existed, appear to have been intended to record historical events, executed after the fact, and apparently reflecting the account receivable balance at a particular time with no reference or relation to specific advances for specific purposes. See South Texas Rice Warehouse Co. v. Commissioner,supra.↩
6. The only series of advances which is documented in any detail are those which resulted in the $8,500 alleged bad debt owed by B & K to Land.↩
7. Some notes may have been executed but, as pointed out above, we can make no specific findings in this regard.↩
8. See deposition of Sam Klink, filed August 15, 1983, pp. 30 and 31: Q (BY MR. JOHNSON:) Was it the intention of Browne and Klink that the advances that were received from Piggy Bank Stations or Piggy Bank Land be maybe [sic] reduced when this permanent financing was obtained by Piggy Bank Land or Piggy Bank Stations? A All the funds concerning Piggy Bank, yes. Q The advances? A The funds that were given to Browne and Klink, that didn't pertain to the particular station, Browne and Klink intended to pay it, yes. Is that what you are asking? Q Well, the advances that were received from Piggy Bank Stations and Piggy Bank Land for the purpose of financing the initial stages of construction, that is what I am referring to. A Yes. Q Was it the intention of Browne and Klink that these advances would be paid from the permanent financing once it was obtained by Piggy Bank Stations or Piggy Bank Land? A Yes.↩