Jan T. Williams v. Commissioner. Anderson T. Williams v. Commissioner.
Williams v. Commissioner
Docket Nos. 1553-80, 1566-80.
United States Tax Court
T.C. Memo 1984-11; 1984 Tax Ct. Memo LEXIS 662; 47 T.C.M. (CCH) 846; T.C.M. (RIA) 84011; January 5, 1984. *662 Corporations: Closely held: Deductions: Sham transactions. -- Payments made by a closely held corporation to its owner and a partnership controlled by him were disregarded during the computation of the corporation's taxable income because the transactions were sham ones that were used simply for the purpose of reducing taxes. The owner acquired the profitable investment corporation with the intent of liquidating it and there was no business reason for it to pay either (1) a management fee of $100,000 to him during the final five weeks of its existence or (2) payments of $150,000 for certain lease rights for benefits that would not accrue until after it was liquidated. -- CCH. Michael L. Cook and Donald J. Reese, P.O. Box 1148, Austin, Tex., for the petitioners. Juan F. Vasquez, for the respondent. WILES
Memorandum Findings of Fact and Opinion WILES, Judge: In these consolidated cases, respondent determined that petitioners were liable, as transferees of Esbanco, Inc.'s assets under section 6901, [1] *663 for a $116,045.80 deficiency in the corporation's Federal income tax for its taxable year ending August 31, 1975. After concessions, [2] *664 the issues remaining for decision are: (1) Whether the rent Esbanco, Inc., paid to a partnership controlled by petitioner, and the salary Esbanco, Inc., paid to petitioner, its sole shareholder, five weeks prior to its planned section 336 liquidation, were part of a tax avoidance scheme lacking economic substance which should be disregarded for Federal income tax purposes; (2) if the transactions are not part of a tax avoidance scheme, (a) whether any portion of the lease payments shall be restored to income under the tax benefit principles, and (b) whether petitioner's salary represents reasonable compensation for services rendered under section 162(a)(1). Findings of Fact Some of the facts have been stipulated and are found accordingly. Petitioner, Anderson T. Williams (hereinafter petitioner), resided in Weslaco, Texas, at the time he filed his petition herein. Petitioner, Jan T. Williams, resided in Austin, Texas, at the time she filed her petition herein. During the year in issue, petitioners were married and they filed joint Federal income tax returns (Form 1040) for the years 1975, 1976, and 1977 with the Internal Revenue Service Center, at Austin, Texas. During 1975, petitioners had a $340,978 personal net operating loss carry-over from 1974. Petitioner filed Esbanco, Inc.'s (hereinafter Esbanco) final corporate income tax return (Form 1020) for the taxable year beginning January 1, 1975 and ending August 31, 1975, with the Internal Revenue Service Center, at Austin, Texas. During 1975, 4T Ranches, Ltd. (hereinafter 4T), a partnership solely owned by petitioners *665 and their minor children, was engaged in farming activity on approximately 8,000 acres of land of which 1,300 acres in the Texas Rio Grande Valley was devoted to the growing of sugar cane. At all times mentioned, Rio Grande Valley Sugar Growers, Inc., was the only sugar mill in Texas.The mill was a cooperative owned directly by the farmers and each share of stock entitled the holder to have one ton of sugar cane both harvested and processed (hereinafter referred to as grinding rights). Since the average production of sugar cane per acre is 42 tons, it was common to refer to "an acre of grinding rights." An acre of grinding rights, which was represented by 42 shares of stock in the mill, obligated the farmer to produce 42 tons of sugar cane. If a farmer produced less than 60 percent of what he was obligated to grow based on the number of acres of grinding rights that he owned, the mill could, and often did, fine the farmer $5 for each ton of sugar cane not delivered. During 1975, there was an abundance of sugar cane and a commensurate shortage of grinding rights. Since sugar cane was practically worthless unless it could be processed, throughout 1975 grinding rights were a valuable *666 commodity selling for about $1,000 an acre. Esbanco was incorporated on January 25, 1972, under the laws of the state of Texas. Its stock was owned by the shareholders of the Elsa State Bank in proportion to their stockholdings in the bank. Esbanco owned 500 acres of grinding rights, although it did not own any farmland. Esbanco did not actively engage in farming activities, rather it entered into a joint venture agreement with Bell Brothers partnership (hereinafter Bell) on August 1, 1972. Bell needed additional grinding rights to harvest and process its abundant sugar cane crop, and Esbanco needed sugar cane. Pursuant to the agreement, Esbanco leased 400 acres of farmland from Bell, and Bell assumed full responsibility to grow sugar cane on those 400 acres as well as an adjoining 300 acres owned by Bell. Esbanco was required to pay 4/7ths of the farming expenses and received 4/7ths of the profits after the sugar cane was marketed. The joint venture agreement was amended on January 15, 1975, to enlarge the acreage which Esbanco leased from 400 acres to 4/7ths of 1,214 acres at $50 per acre. On July 23, 1975, the agreement was again amended. The second amendment provided in part *667 that the parties intended their interests in the joint venture to be freely transferable, and specifically that Bell consented to Esbanco's transfer of its 4/7th interest in the venture to a general partnership (not yet formed) whose members shall consist of petitioner, Dr. McKinney, and Dr. Simmons. Sometime prior to purchasing Esbanco's stock, petitioner contacted Dr. McKinney and Dr. Simmons to discuss his intent to acquire Esbanco's stock, liquidate the corporation and distribute all of its assets to himself; petitioner would then contribute the assets he received in Esbanco's liquidation to a newly formed partnership and would sell both Dr. McKinney and Dr. Simmons a 20 percent interest in the newly formed partnership. On July 25, 1975, petitioner purchased all the capital stock of Esbanco. On that same day petitioner caused Esbanco to issue four checks: two checks totalling $150,000 were made payable to 4T, one in the amount of $80,000 with the notation "Lease of 800 acres of land for one year commencing September 1, 1975" and the second in the amount of $70,000 with the notation "Lease of 100 acres of grinding rights for sugar cane and root stock -- 500 acres"; two checks *668 were made payable to petitioner, one in the amount of $50,000 with the notation "dividends" and the other in the amount of $100,000 with the notation "salary." [3] Prior to July 25, 1975, Esbanco had no salaried employees and was managed gratuitously by its shareholder(s). On August 15, 1975, petitioner caused Esbanco to enter into a "farmlease" with 4T, whereby Esbanco paid 4T $128,000 ($160 per acre) for the option to lease 800 acres of sugar cane farmland from 4T (hereinafter sometimes referred to as the option). This option extended from August 15, 1975 until the end of the 1976-1977 harvesting season which was generally from October 1976 through May 1977. On August 29, 1975, Esbanco's board of directors adopted a plan of complete liquidation in which it was resolved that all of Esbanco's assets would be distributed to petitioner, its sole shareholder. Pursuant to the plan of liquidation, Esbanco was liquidated on August 31, 1975, and all of its assets, valued at $653,291.04, were *669 distributed to petitioner. The next day, September 1, petitioner contributed the assets he received from the Esbanco liquidation to the Raw Sugar Company, a partnership which was newly formed by petitioner, Dr. McKinney, and Dr. Simmons. The Raw Sugar Company replaced Esbanco in the joint venture agreement with Bell. On October 1, 1975, rather than leasing 100 acres of grinding rights from 4T, the joint venture leased 100 acres of sugar cane to 4T for $10. On August 30, 1978, petitioners signed a transferee agreement (Form 2045) with respondent in which petitioners agreed to be liable as transferees of the assets of Esbanco for any tax liability finally determined for its taxable year ending August 31, 1975. On its final return for its taxable year ending August 31, 1975, Esbanco claimed a business deduction for $150,000 as rent paid to 4T, and $100,000 as a management fee paid to petitioner. In the notice of deficency, respondent disallowed these claimed deductions in their entirety, resulting in a deficiency of $116,045.80 in Esbanco's Federal income tax for the fiscal year ending August 31, 1975. Under section 6901, respondent asserted liability against petitioners for the *670 deficiency as transferees of Esbanco's assets. Opinion Respondent's primary contention is that the rental and salary payments Esbanco made on July 25, 1975, [4] were part of a tax avoidance scheme to drain Esbanco of its current earning and profits prior to its anticipated liquidation which should be disregarded for Federal income tax purposes. For the reasons set forth below, we agree. It is well established that transactions entered into solely for the purpose of tax avoidance, which lack any business purpose, are shams and without effect for Federal income tax purposes. Frank Lyon Co. v. United States [78-1 USTC P9370], 435 U.S. 561 (1978); Knetsch v. United States [60-2 USTC P9785], 364 U.S. 361 (1960). Compare Goldstein v. Commissioner [66-2 USTC P9561], 364 F. 2d 734 (2d Cir. 1966), affg. [Dec. 27,415] 44 T.C. 284 (1965). See Rice's Toyota World, Inc. v. Commissioner [Dec. 40,410], 81 T.C. 184 (1983). The leading case supporting the existence of a "sham transaction doctrine" is Gregory v. Helvering [35-1 USTC P9043], 293 U.S. 465 (1935). There a reorganization which complied with all the formal statutory requirements was disregarded for *671 Federal income tax purposes because no valid economic purpose existed for the creation and immediate liquidation of the transferee corporation. The transaction was simply an attempt to convert ordinary income into capital gain. The Court's decision was based not on the tax-avoidance motive of the taxpayer but rather on the lack of a valid business purpose for the transaction which the statutory scheme contemplated. While the taxpayer is generally free to structure business transactions in such a way as to minimize taxes, or all together avoid them, such transactions will not be respected for Federal income tax purposes when the taxpayer fails to establish the presence of a business purpose for the transaction. Gregory v. Helvering, supra at 469; Rice's Toyota World, Inc. v. Commissioner, supra, and cases cited therein. As we noted in Braddock Land Co. v. Commissioner [Dec. 37,431], 75 T.C. 324, 329 (1980), the "sham transaction doctrine" is not limited to the field of corporate reorganizations, but rather applies to Federal taxing statutes generally. In ascertaining whether a given transaction has a valid business purpose, and is therefore not a "sham," we will consider the taxpayer's *672 motives for entering into the transactions as well as whether the transaction has any economic substance apart from beneficial tax consequences. Rice's Toyota World, Inc. v. Commissioner, supra at 209-210. In the instant case we must examine Esbanco's alleged rental payments totalling $150,000 to 4T, a partnership owned 100 percent by petitioner and his immediate family, and the salary of $100,000 paid to petitioner, Esbanco's sole shareholder, in light of all the surrounding circumstances to determine whether these expenses have a valid business purpose and should be respected for Federal income tax purposes. The following series of events clearly establish that petitioner purchased Esbanco's capital stock, and caused Esbanco to issue checks to 4T and himself, with the intent to promptly liquidate the corporation. Sometime prior to purchasing all of Esbanco's outstanding stock, petitioner contacted Dr. McKinney and Dr. Simmons to advise them of his plan to liquidate Esbanco, form a new partnership with its assets, and sell them a 20 percent interest in the new partnership. On July 23, 1975, two days before petitioner purchased all of Esbanco's capital stock, Esbanco, at petitioner's *673 request, amended its joint venture agreement with Bell to provide for the transfer of Esbanco's interest in the joint venture to a partnership (not yet created) whose members would consist of petitioner, Dr. McKinney, and Dr. Simmons. Two days later, on July 25, petitioner purchased all the capital stock of Esbanco, and Esbanco made the payments in issue to petitioner and 4T. On August 31, 1975, less than five weeks later, petitioner liquidated Esbanco under section 336 and distributed its assets to himself.The next day, petitioner contributed the assets he received in Esbanco's liquidation to the newly created Raw Sugar Company, a partnership which consisted of petitioner, Dr. McKinney, and Dr. Simmons. Since Esbanco earned substantial profits during 1975, in the absence of offsetting business deductions, it would be subject to corporate level income tax for its final taxable year ending with the liquidation on August 31, 1975. In order to reduce Esbanco's taxable income prior to its planned liquidation, petitioner created business deductions. On July 25, 1975, the day petitioner purchased Esbanco's stock, he caused Esbanco to pay himself $100,000 as a management fee and to issue *674 4T two checks totalling $150,000 in the amounts of $80,000 and $70,000, respectively. Petitioner asserts that these two checks represented rental payments on the option to lease 800 acres of sugar cane farmland for $128,000, and on the lease of 100 acres of grinding rights for $22,000. [5] If given effect, the rental payments to 4T and the salary paid to petitioner would reduce Esbanco's taxable income while at the same time distributing untaxed corporate earnings to petitioner prior to its liquidation. [6]
In support of his position that the rental payments to 4T had a business purpose, petitioner argues that the option was necessary to protect Esbanco in the event Bell defaulted on its agreement to lease Esbanco *675 400 acres of farmland. Petitioner asserts that if Bell defaulted on its landlease, Esbanco would not only lose potential profits but would be subject to a possible fine from the mill.[7] However, upon review of the record, we are convinced that because of the abundance of sugar cane and commensurate shortage of grinding rights during the years in issue there was no business purpose in executing the option. During the years in issue, there was no indication, other than petitioner's self-serving testimony which we do not accept as fact, that Bell would default on the land-lease agreement. See South Texas Rice Warehouse Co. v. Commissioner [66-2 USTC P9619], 366 F. 2d 890, 898 (5th Cir. 1966), affg. [Dec. 27,223] 43 T.C. 540 (1965), cert. denied 386 U.S. 1016 (1967). In fact, the record indicates that Bell needed Esbanco's grinding rights more than Esbanco needed the sugar cane because during 1975 there was an abundance of sugar cane crop and insufficient grinding rights available to have it harvested *676 and processed. Petitioner and his accountant, Mr. Corn, both testified that grinding rights were very valuable in 1975, selling as high as $1,000 an acre. Therefore, we find that petitioner's fears of Bell's default are unfounded and unsupported by the record. Moreover, even if Bell did default Esbanco could have easily obtained sugar cane or leased its 500 acres of grinding rights for $110,000 [8] rather than pay 4T $160 an acre for an option to lease farmland when Esbanco was only paying Bell $50 an acre to actually lease farmland. Our conclusion that the option lacked a valid business purpose is further supported by petitioner's failure to observe even the slightest bit of formality in executing this transaction. The record abounds with inconsistencies concerning the duration of the option and the consideration paid for the option. Esbanco paid for the option with a check drawn to 4T on July 25, 1975, the *677 date petitioner purchased all of Esbanco's stock and at which time petitioner intended to liquidate Esbanco. This check was in the amount of $80,000 and bore the notation "lease of 800 acres of land for one year commencing Sept. 1, 1975." Contrary to the notation on Esbanco's check, petitioner argues Esbanco paid 4T $128,000 to lease 800 acres of farmland. In support of his position, petitioner produced an agreement executed by Esbanco and 4T on August 15, 1975, 20 days after Esbanco paid 4T for the option. The agreement provided that for consideration of $128,000 ($160 per acre) Esbanco had the option to lease a specified 800 acres of land. The option ran from August 15, 1975 until the end of the 1976-1977 harvesting season; thus, the benefit of the option, if any, would not accrue until after Esbanco was liquidated. Furthermore, 4T grew and harvested sugar cane on the "optioned" land and Esbanco's successor, the Raw Sugar Company, never exercised or renewed this option. We will now focus our attention to Esbanco's alleged lease of 100 acres of grinding rights from 4T. Petitioner argues that this lease protected Esbanco in the event Bell did not default on its landlease because *678 the joint venture would have insufficient grinding rights to harvest all the sugar cane grown. [9] We are convinced, however, that like the option, this lease lacked a business purpose. To being with, petitioner has failed to produce a copy of Esbanco's lease of grinding rights from 4T. The only written evidence of this lease is the notation on Esbanco's $70,000 check issued on July 25, 1975. At trial, petitioner produced a lease executed by the Raw Sugar Company and Bell on October 1, 1975, in which the joint venture leased 100 acres of sugar cane farmland to 4T. Petitioner testified at trial that the October 1 lease represented the agreement between Esbanco and 4T under which Esbanco paid 4T $22,000 for lease of 100 acres of grinding rights. Apart from the obvious inconsistency with Esbanco's $70,000 payment check, the October 1 lease provided for consideration of $10 not $22,000 as was deducted by Esbanco. More importantly, however, we are unpersuaded that Esbanco *679 could possibly benefit economically from a lease executed by its successor, the Raw Sugar Company, two months after Esbanco was liquidated. In sum and substance, the $150,000 in rental payments to 4T were simply an attempt by petitioner, void of any economic substance, to reduce Esbanco's taxable income prior to its preplanned liquidation. We now turn to consideration of the $100,000 salary paid by Esbanco on July 25, 1975, to petitioner, its sole shareholder. In an attempt to establish a business purpose for his salary, petitioner argues on brief that "Esbanco paid a dividend of $50,000 to taxpayer, which indicates that the management fees actually were management fees and not a distribution of profit." Upon review of all the surrounding circumstances, we disagree. Petitioner's $100,000 salary check was issued on July 25, 1975, the day petitioner purchased Esbanco's stock with the intent to liquidate the corporation and the same day Esbanco made the lease payments to 4T. Prior to that day, petitioner had no relationship with Esbanco, therefore, his salary, if for anything, was prepayment for future service. Since petitioner liquidated Esbanco on August 31, 1975, it represented *680 advance payment for five weeks of management services. We find, however, that petitioner performed little or no services for the corporation. Esbanco's role in the joint venture with Bell was that of a passive investor. In fact, the joint venture agreement specifically provided that Bell would perform all services required in growing the sugar cane. Because of its passive role in the joint venture, Esbanco required a minimum of management and it had never before compensated anyone for its management. More significantly, the Raw Sugar partnership, Esbanco's successor, specifically provided in its partnership agreement that the managing partner, which was petitioner, would not receive any compensation for the services rendered. It strains credulity to believe that Esbanco had a business purpose in paying petitioner a $100,000 management fee in advance for services which if performed at all, would have to be performed during the five weeks prior to the corporation's preplanned liquidation. Moreover, we are convinced that any services which petitioner may have performed were in his capacity as an "investor" in Esbanco and in furtherance of his investment activities in the Raw Sugar *681 Company. Accordingly, we find that the salary paid to petitioner by Esbanco was void of economic substance and served no valid business purpose. After careful evaluation of the record herein, we find that the lease payments to 4T as well as the salary paid to petitioner were part of a tax avoidance scheme which lacked any economic substance other than the reduction of Esbanco's taxable income. We hold, therefore, that these transactions were a sham which lacked a business purpose and should be disregarded for Federal income tax purposes. Since we find that these transactions were a sham and in whole not deductible, we need not decide (a) whether any part of the lease payments should be restored to Esbanco's income under the tax benefit rule, or (b) whether petitioner's salary represented reasonable compensation for services rendered under section 162(a)(1). To reflect the foregoing, Decisions will be entered for the respondent. Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated.
2. Petitioners have apparently conceded the issue of their liability as transferees of Esbanco, Inc.'s assets under section 6901 for taxes due for its fiscal year ending August 15, 1975. The parties have stipulated that petitioners executed a "Transferee Agreement" (Form 2045) on August 30, 1978, thereby assuming liability as transferees for income taxes due for Esbanco, Inc.'s 1975 fiscal year. Furthermore, petitioners have not disputed their liability for Esbanco, Inc. income tax deficiencies either at trial or on brief. Accordaingly, we find that petitioners are liable as transferees under section 6901 for any taxes due from Esbanco, Inc., for its 1975 fiscal year. See Bellin v. Commissioner [Dec. 33,600], 65 T.C. 676, 680-681↩ (1975).
3. The $50,000 dividend paid to petitioner is not in issue; consequently, the only payments at issue are the rental payments totalling $150,000 made to 4T and the salary of $100,000 paid to petitioner.↩
4. See n. 3, supra and accompanying text.↩
5. Petitioner has not explained why the two checks totalling $150,000 were drawn in amounts which differed from the two lease payments which also totalled $150,000. ↩
6. Petitioner had a $340,978 personal net operating loss for 1975 and could absorb Esbanco's current earnings without incurring personal tax liability. While a liquidating distribution or a dividend would have placed corporate earnings within petitioner's control, neither would reduce the corporation's taxable income.↩
7. In the event a farmer produced less than 60 percent of what he was obligated to, based upon the number of grinding rights he owned, the mill could fine him $5 for each ton not delivered.↩
8. The only evidence in the record of the rental value of grinding rights is petitioner's assertion that Esbanco leased 100 acres of grinding rights for 4T for $22,000 or $220 an acre. For the purposes of this opinion, we accept this as the fair rental value of grinding rights.↩
9. We note that petitioner's positions are inconsistent, asserting that option was necessary to protect Esbanco if Bell defaulted, while arguing that the lease of grinding rights protected Esbanco if Bell did not default.↩